DECISION AND JUDGMENT ENTRY
This appeal comes to us from an order of the Lucas County Court of Common Pleas which preliminarily enjoined a medical school from terminating a surgical resident. Because we conclude that the trial court had subject-matter jurisdiction in this case and did not abuse its discretion in issuing its order, we affirm.
Appellee is Dr. Christina B. Grudzinski, a third-year surgical resident in a graduate medical education program operated by appellant Medical College of Ohio ("MCO") and run by MCO's surgical chair, appellant Dr. Edgar D. Staren.
Appellee received her doctor of medicine degree from the University of Southern California in 1994. She then entered a surgical residency program at the University of California-Irvine ("U.C.-Irvine"). At the conclusion of her first year of residency, appellee lodged a complaint with the Accreditation Council for Graduate Medical Education ("ACGME"), alleging that she had been sexually harassed by both an attending physician and her chief resident. The complaint led to the termination of the offending physician. According to appellee, U.C.-Irvine retaliated against her by dismissing her at the beginning of her second year of residency. Appellee then sued UC-Irvine and several associated individuals for sexual harassment and wrongful termination from the program.[1]
In 1996, appellee was admitted to another surgical residency program at the University of Texas at Houston ("U.T.-Houston"). Appellee states that in Texas she was subjected to inappropriate sexual conduct similar to her California experience. Appellee also complained that individuals at UT-Houston retaliated against her at the behest of the defendants in her UC-Irvine lawsuit. After six months, appellee resigned from the UT-Houston program in lieu of termination.
In 1998, appellee obtained a preliminary residency position[2] at New York's Nassau County Medical Center. There, she was able to complete her second post-graduate year ("PGY") of surgical training, apparently without incident.
In the spring of 1999, appellee learned of and applied for a categorical PGY-III position at MCO. With her letter of application, appellee submitted a curriculum vitae which omitted her program participation in Texas. Appellee did not omit her time in Texas in her official application for a training certificate submitted to the State Medical Board of Ohio and, in fact, wrote a four page single spaced account of the events at UC-Irvine and UT-Houston which she appended to the application. Appellee was also forthcoming about these events when asked during a preappointment interview conducted by Dr. Prabir Chaudhuri, then acting head of surgery at MCO. The topic apparently did not come up in similar interviews with appellant Dr. Staren or in a third interview with surgical professor Dr. Jonathan Saxe.
Appellee was offered the categorical surgery residence position at MCO. On June 22, 1999, the parties entered into a "Graduate Medical Education Agreement," commencing on July 1, 1999, and ending on June 30, 2000. In conformity with ACGME policies, the contract provided that appellee would not be disciplined, reassigned, suspended or terminated from the program but for just cause. The contract permitted that disciplinary action be immediate, but one who is suspended or otherwise disciplined must be afforded a hearing at which he or she must be given the "opportunity to appear and be heard * * * present witnesses and be assisted by a personal representative, [but] not * * * an attorney at law." One not satisfied with the results of this hearing may grieve the decision in multiple levels of appeal, each taking between twenty and thirty days.
Appellee's first rotation in her year of residency was three months in cardiothoracic surgery. There, according to appellee, she performed or assisted in more than two hundred surgical procedures. Her evaluation from this rotation was unremarkable, although her evaluating physician noted that she was enthusiastic.
Appellee next rotated to the trauma unit at St. Vincent's Hospital in Toledo. There she received evaluations from two senior physicians who rated her as above average and occasionally outstanding. However, a junior evaluating physician rated appellee as "unsatisfactory" in promptness, a category both of the senior physicians had rated her as "above average."
In January 2000, appellee moved to a pediatric surgical residency at the Children's Hospital Medical Center in Cincinnati, Ohio. There, at the outset, appellee was required to be on the night call every other night, because of the emergency absence of another resident.[3] Appellee apparently complained vocally about this. When appellee had to quickly return to Toledo on personal business, the physicians in charge of the Cincinnati program wrote to Dr. Staren complaining of appellee's unreliability and questioning her clinical skills. This letter is dated February 2, 2000.
The time line of what followed is not clear from the record. If appears that on receipt of the Cincinnati physician's letter, Dr. Staren met with appellee and informed her that because of the issues raised in the letter and other complaints, he would recommend to the residency evaluation committee ("REC") that appellee be placed on academic probation for four months. A February 3, 2000 letter from the Cincinnati physicians to Dr. Staren states that, subsequent to the first letter, they met with appellee, resolved some miscommunications, and looked forward to continuing to work with appellee in an effort to help her improve during the remainder of her pediatric surgical rotation. On February 4, 2000, Dr. Staren called the Cincinnati hospital, informing the doctors there that he had suspended appellee from the program and removed her from the pediatric rotation. On February 7, 2000, Dr. Staren wrote to appellee formally informing her of her suspension and noting that subsequent to his February 2 meeting with her, he had discovered that appellee had omitted her tenure at the U.T.-Houston from her curriculum vitae.
A "due process" hearing before the Residency Evaluation Committee to consider appellee's suspension was set for February 14, 2000. Dr. Staren conducted the hearing which he limited to one hour. Appellee was denied representation of legal counsel during the hearing. The hearing was almost exclusively a dialog between appellee and Dr. Staren, with Dr. Staren repeatedly reminding appellee of the time and his intention to conclude the proceedings in exactly one hour.
Appellee outlined her experience at UC-Irvine and UT-Houston. Regarding the omission of the UT-Houston residency on her curriculum vitae, appellee stated to the committee that it had been a painful experience for her. Moreover, she maintained, that when she was required to state that she had been in Texas, as on the state training certificate application, or when asked about that period, by Dr. Chaudhuri, she was forthcoming and candid. She also called Dr. Chaudhuri as a witness to confirm that she had discussed the issue at length with him. Appellee also presented the testimony of a Toledo surgeon who had been a resident at the U.T.-Houston during the same time that appellee was a resident. The Toledo surgeon confirmed appellee's characterization of the UT-Houston environment as "hostile to women."
With respect to her purported clinical deficiencies, appellee told the committee that, after the initial Children's Hospital letter to Dr. Staren, she met with the physicians in Cincinnati and resolved any concerns. The result was the second letter from Cincinnati indicating the institution's desire to continue working with her.
Concerning deficiencies alleged during appellee's trauma rotation, appellee presented the committee with multiple letters from physicians, nurses, and others at St. Vincent attesting to appellee's enthusiasm, competence and collegiality. The meeting was then adjourned.
In a letter dated March 1, 2000, appellant Dr. Staren informed appellee that based on the issues discussed at the February 14 hearing the residency evaluation committee had decided to "permanently suspend" her from MCO's residency program.
On March 6, 2000, appellee instituted the suit which underlies this appeal. Appellee asserted that she was denied the due process to which she was contractually entitled and that appellants' decision to permanently suspend her was, "* * * not for just cause, but was arbitrary and capricious * * *." Included in appellee's complaint was a request that the trial court issue a preliminary injunction to preserve the status quo ante. The effect of a failure to grant this provisional remedy, appellee argued, would cause her irreparable harm.
The matter came before the court for a hearing. At this hearing the transcript of the taped February 14 REC hearing was admitted by stipulation and live testimony was presented by appellee and Dr. Chaudhuri. Dr. Chaudhuri repeated his account of discussing appellee's experience in Texas with her prior to her admission into the MCO residency program.
Dr. Staren did not testify, but REC member Dr. Jonathan Saxe testified that approximately a week following the February 14 hearing, the REC reconvened. According to Dr. Saxe, at that point he informed other members of the committee about one incident in which appellee had missed an appendicitis diagnosis for one of his patients. Dr. Saxe reported that other members of the committee relayed similar incidents and that on the basis of the February 14 hearing and this later information, the committee ratified Dr. Staren's permanent suspension of appellee.
On March 27, 2000, the trial court granted appellee's petition for a preliminary injunction, setting forth its findings of fact as follows:
 "From its review of the transcript of proceedings, the court finds that the due process hearing was a sham. Not only was plaintiff restricted to a very limited time within which to present any defense to the charges made against her, but the testimony of the only physician who testified regarding the action of the resident evaluating committee, Jonathan B. Saxe, M.D., confirmed that the resident evaluating committee met after February 14, 2000 and considered information exchanged by Dr. Saxe and by other physician members of the committee that had not been presented to Dr. Grudzinski on February 14, 2000. The committee then relied upon such evidence in deciding to permanently suspend her from further participation in the residency program. In effect, plaintiff was suspended from the program after being afforded but one hour to explain her position, without substantial comment from physician members on February 14, 2000. Those commission members then met privately for 30 to 45 minutes, shared episodes, events or anecdotes which were never discussed with Dr. Grudzinski and about which she had no notice or opportunity to comment, and then confirmed the permanent suspension imposed by the program director."
The court concluded that appellants' actions were "arbitrary and capricious" and a denial of, "* * * both a fair hearing and due process of law." The court further concluded that, on the evidence adduced, it was likely that appellee's dismissal was without just cause and probable that appellee would prevail on the merits.
Appellants now appeal this provisional remedy. See R.C.2505.02(B)(4). On motion, appellants sought, pursuant toState ex rel. State Fire Marshall v. Curl (2000), 87 Ohio St.3d 568, a stay of the injunction. On authority of Curl, we granted the stay, but accelerated our consideration of the merits of the appeal. Grudzinski v. Medial College of Ohio (Mar. 30, 2000), Lucas App. No. L-00-1098, unreported; (Apr. 4, 2000), Lucas App. No. L-00-1098, unreported.
Appellants set forth the following two assignments of error:
 "1. First Assignment of Error. The trial court erred when it granted a preliminary injunction when it had no subject matter jurisdiction.
 "2. Second Assignment of Error. The trial court erred when it granted a preliminary injunction against appellants."
 EXHAUSTION OF REMEDIES
In their first assignment of error, appellants insist that the trial court erred when it exercised jurisdiction and failed to dismiss appellee's suit for a failure to exhaust administrative remedies. This failure to exhaust administrative remedies is fatal to appellee's cause of action, appellants contend.
Directly on point, according to appellants, is Nemazeev. Mt. Sinai Medical Center (1990), 56 Ohio St.3d 109, in which a first year medical resident brought suit after being dismissed from a private pediatric residency program. Mt. Sinai, like MCO, had in place an administrative appeal process in which Nemazee refused to participate. The Cuyahoga County Court of Common Pleas dismissed Nemazee's suit because of his failure to exhaust administrative remedies. However, when Nemazee prevailed on appeal, the matter came before the Supreme Court of Ohio which reversed the court of appeals and reinstated the trial court's dismissal. In an unanimous decision, the court held,
 "A physician in a private hospital whose employment and/or hospital privileges have been terminated must exhaust all internal administrative remedies prior to seeking judicial review." Id. at syllabus.
Appellee responds that exhaustion of administrative remedies is inapplicable in this case because pursuit of those remedies would constitute a vain act. When the employment of administrative remedies would be in vain, exhaustion of the process is not required. See, id. at 115. According to appellee, pursuit of appeals at MCO would be in vain because of the professional and personal interrelationship of the individuals involved in the process. Moreover, appellee contends that the seeking of a preliminary injunction to remain in the residency program is not an avoidance of the administrative process; rather, it is merely maintaining the status quo while the administrative process proceeds.
While the facts of Nemazee and the facts at bar are similar, there are critical differences. First, Nemazee's complaint was at law seeking damages for breach of contract and intentional infliction of emotional distress. Additionally, Nemazee refused to participate in the administrative process, characterizing it as so tainted and lacking due process that his participation would be futile.
While appellee may have other claims, the only issue before this court is the equitable relief afforded by the trial court. The preliminary injunction which appellee sought and received only served to maintain appellee in the position she was in when the disputed decision to remove her occurred. Moreover, she has not refused to employ administrative remedies. She merely asks no change in her position while these proceedings play out.
While this factually distinguishes this case from Nemazee, however, it does not absolve us from an exhaustion of remedies analysis. The general rule remains that in Ohio before one may avail herself of the judicial system, she must first exhaust available avenues of administrative relief. Id. at 111, citing Noernberg v. Brook Park (1980), 63 Ohio St.2d 26, 29; Stateex rel. Lieux v. Westlake (1951), 154 Ohio St. 412. The rule is one of judicial economy and is intended to permit agencies to apply their special expertise to develop a factual record should litigation eventually ensue. Nemazee at 111-112. It is not jurisdictional, but may be raised as an affirmative defense.Jones v. Chagrin Falls (1997), 77 Ohio St.3d 456, syllabus.
A perhaps unfortunately named exception to the exhaustion rule is the "vain act" exception. A vain act is defined as a circumstance wherein the administrative body is without authority to grant the relief requested. Id. at 115, citing Gates Mills Investment Co. v. Pepper Pike (1978),59 Ohio App.2d 155, 166. Consequently, the exception operates not in the sense that there is small probability that the relief sought will be granted, but only when the administrative relief sought is beyond the authority of the agency. Id. In this context appellee's assertion that the likelihood of her success on appeal is limited because of the professional and personal relationship of those involved in the process is unavailing.
There is, however, a broader connotation to the term "vain act." A lack of authority to grant relief is a subset of the greater concept that the doctrine of exhaustion of remedies will apply only, "* * * if there is a remedy which is effectual to afford the relief sought." Kaufman v. Newburgh Heights (1971),26 Ohio St.2d 217, syllabus.
In this matter, it is uncontested that if appellee does not complete the final rotation in her residency, she will be set back a minimum of one year in her medical education and may even need to repeat one or both of her two prior years of graduate studies. Appellee cannot complete her final rotation if thestatus quo is not maintained. The rotation lacks three months. The appeals procedure provided by appellants is a series of steps each taking between twenty and thirty days. Essentially then, appellants' administrative appeals process preordains an unfavorable conclusion as long as appellee is not permitted to participate in the program while the administrative appeal is pending. This remedy is not effectual to afford appellee the relief sought. Consequently, the doctrine of exhaustion of remedies will not apply.
Accordingly, appellants' first assignment of error is not well-taken.
 PRELIMINARY INJUNCTION
In their second assignment of error, appellants assert that the trial court's decision to enjoin them from removing appellee from the residency program was error.
A preliminary injunction is a device intended to maintain the status quo pending final adjudication of a case on the merits. Yudin v. Knight Indus. Corp. (1996), 109 Ohio App.3d 437,439; Cardinale v. Ottawa Regional Planning Comm. (1993),89 Ohio App.3d 747, 757. The decision of whether to grant or deny such an injunction rests in the sound discretion of the court and will not be reversed absent an abuse of that discretion. Johnsonv. Morris (1995), 108 Ohio App.3d 343, 351-352, citing Perkins v.Quaker City (1956), 165 Ohio St. 120. An abuse of discretion is more than an error of law or of judgment, the term connotes an attitude by the court that is unreasonable, arbitrary, or unconscionable. Berk v. Matthews (1990), 53 Ohio St.3d 161,168-169.
In this matter, the trial court specifically concluded that appellee's "due process" hearing was a "sham." The severe limitation of appellee's ability to respond within the arbitrary time stricture imposed at the hearing coupled with the amorphous nature of the allegations presented there, gives us reason to question the fundamental fairness of this proceeding. Of greater concern to us is the testimony of appellants' own witness, Dr. Saxe, who testified that after the "due process" hearing, further allegations against appellee were brought by himself and others and considered at the meeting of the residency evaluation committee which decided appellee's fate. Clearly, as appellee knew nothing of these allegations, she had no opportunity to respond to these incidents of alleged misconduct. Notice and an opportunity to be heard are the most basic benchmarks of due process. Consequently, we conclude that the trial court's observation that these proceedings were a sham is supported by the evidence. Accordingly, the court did not abuse its discretion in making its determination.
Appellants also argue before us, as they did before the trial court, that appellee's clinical judgment is so poor that patients' lives may be at stake. This argument would carry weight if there was any evidence in the record to support it. Instead, the record contains evaluations which are uniformly positive about appellee's clinical abilities and dedication (although admittedly critical of non-clinical items like punctuality). Appellants' testimony that she successfully performed more than two hundred surgical procedures at MCO is uncontroverted. The critical communication from the Cincinnati Children's Hospital physicians was withdrawn. The only specifically critical assessment of appellee's clinical abilities was Dr. Saxe's testimony (to which appellee was never permitted to respond) that appellee once misdiagnosed an appendicitis, without unfortunate consequence. Moreover, we do not believe that appellant MCO actually wishes to argue that it is incapable of supervising its residents to the extent that patients' lives are threatened. Consequently, we must conclude that the trial court's rejection of this argument was also within its discretion.
Accordingly, appellants' remaining assignment of error is not well-taken.
On consideration whereof, the judgment of the Lucas County Court of Common Pleas is affirmed. Our prior stay of the trial court's order is dissolved and the case is remanded for further proceedings. Costs to appellants.
 _____________________ Peter M. Handwork, J.
Melvin L. Resnick, J., James R. Sherck, J., CONCUR.
[1] This suit proved unsuccessful in a California trial court and is now, according to appellee's testimony, on appeal.
[2] A "preliminary" residency position is different from a "categorical" position in that the former is temporary while at the latter the expectation is that the resident's yearly contract will be renewed for the full amount of the program, in this instance, a five-year surgical training program.
[3] Appellee asserts that this type of schedule is in violation of the spirit, if not the letter, of ACGME rules.